# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**UNITED STATES OF AMERICA**

**v.**

**ANDREW DEMETRIC GILLUM**
  **and**
**SHARON JANET LETTMAN-HICKS**

_____/

**SEALED**
**<u>INDICTMENT</u>**

4:22·CR·27-AW/MAF

**THE GRAND JURY CHARGES:**

## COUNT ONE

### A. INTRODUCTION

Except as otherwise indicated, at all times material to this indictment:

1.    The City of Tallahassee was in Leon County, Florida. Between in or about February 2003 and in or about November 2014, Defendant **ANDREW DEMETRIC GILLUM** ("**GILLUM**") served as a Commissioner on the Tallahassee City Commission.

2.    Between in or about November 2014 and in or about November 2018, **GILLUM** served as Mayor of the City of Tallahassee. In 2016, while serving as Mayor, the City of Tallahassee paid **GILLUM** a salary of approximately $70,541.48. Beginning in or about early 2017 and continuing through November


FILED USDC FLND TL
JUN 7 '22 PM4:05 TPM

2018, while serving as Mayor of Tallahassee, **GILLUM** sought election for the office of Governor of Florida in the November 2018 election.

3.      Beginning in or around April 2015, the FBI conducted a public corruption investigation in Tallahassee, Florida, which eventually included the activities of **GILLUM** and Individual A.

4.      In early 2016, an FBI undercover agent ("UCE 1") entered into an agreement with Individual A under which Individual A would introduce UCE 1 to public officials and assist UCE 1 by advocating for official government actions in return for a monthly payment. During this time, UCE 1 posed as a developer interested in purchasing and developing property in Tallahassee through a company known as Southern Pines Development LLC ("Southern Pines").

### SOLICITATION OF CAMPAIGN CONTRIBUTIONS FROM FBI UNDERCOVER AGENTS

5.      On or about March 25, 2016, in a telephone conversation with UCE 1, Individual A solicited a $5,000 campaign contribution for **GILLUM**'s newly formed political action committee, Forward Florida Political Action Committee ("Forward Florida PAC").

6.      On or about April 8, 2016, Individual A stated to UCE 1 that Individual A knew that UCE 1 liked to fly under the radar and suggested that UCE 1 pay for dinner at a campaign fundraiser Individual A was hosting for **GILLUM**.

Individual A suggested that UCE 1 pay a restaurant (which Individual A owned) directly and therefore the payment would not be reported on any campaign finance reports. Individual A promised that **GILLUM** would know that UCE 1 paid for the meal and that UCE 1 would get credit for contributing to the fundraiser. UCE 1 agreed to pay for the dinner.

7.      On or about April 11, 2016, Individual A hosted a fundraiser for Forward Florida PAC at Individual A's residence. Subsequently, in late April 2016, UCE 1 paid approximately $4,386 for the dinner served at the fundraiser for **GILLUM**'s Forward Florida PAC.

8.      After the April 11, 2016, fundraising dinner, **GILLUM** called UCE 1 and thanked UCE 1 for paying for the dinner at the fundraiser for Forward Florida PAC.

9.      On or about May 16, 2016, Individual A, **GILLUM**, UCE 1, and another FBI undercover agent ("UCE 2") met in Tallahassee. During the meeting, Individual A stated, in **GILLUM**'s presence, that Individual A knew that **GILLUM** had already called UCE 1, but **GILLUM** wanted to express appreciation for UCE 1's support for the fundraising event.

10.      On or about August 10, 2016, UCE 1 and UCE 2 met with **GILLUM** in New York, New York. During the trip, the UCEs paid for **GILLUM**'s lodging

at the Millennium Hilton hotel, food and drink, a boat ride around New York Harbor, and a ticket to the Broadway show "Hamilton."

11.    Florida law required municipal officials such as **GILLUM** to file a Form 9, "Quarterly Gift Disclosure," with the Florida Commission on Ethics if the official accepted a gift valued at more than $100. This Form 9 was required to be filed during the calendar quarter for which the gift was received, and describe the gift, the name and address of the person making the gift, and the date the gift was received.

12.    On or about December 28, 2016, **GILLUM** filed a Quarterly Gift Disclosure with the Florida Commission on Ethics. **GILLUM** failed to disclose gifts valued more than $100 received from the UCEs.

13.    In late October 2016, Individual B, solicited a $25,000 contribution from UCEs 1 and 2 to a political action committee to support **GILLUM**'s run for Governor. Individual B had a conversation with UCE 2 on October 28, 2016, where UCE 2 said that if UCE 2 were to donate that much money, he would want something very significant in return. Individual B repeatedly stated that would not be a problem.

14.    On or about October 29, 2016, Individual B discussed the $25,000 contribution for **GILLUM** with UCE 1. Individual B explained to UCE 1 that they had a "communications company" that everything would go through to avoid UCE

4

1's name being listed. Later that day, Individual B spoke to UCE 2 again about the $25,000 donation. UCE 2 told Individual B that if UCE 2 donated $25,000 to **GILLUM**'s campaign, UCE 2 would want a guarantee that UCE 2 would receive unencumbered government contracts. Individual B again stated that this would not be a problem.

15.    On or about November 30, 2016, Individual B discussed the $25,000 contribution with both UCEs. During the conversation, UCE 2 stated that he did not want to have his name on a contribution if UCE 2 was going to get something in return and that UCE 2 did expect something in return. UCE 2 also stated that the money needed to go to an account with **GILLUM**'s name on it. Individual B suggested routing the contribution through P&P Communications, which is an entity controlled by Defendant **SHARON JANET LETTMAN-HICKS** (**"LETTMAN-HICKS"**). Individual B stated that **LETTMAN-HICKS** would be substantially involved with **GILLUM**'s campaign. Individual B confirmed to the UCEs that **GILLUM** knew that he was meeting with the UCEs, knew everything that Individual B does, and he had an agreement with **GILLUM** that everything Individual B talked about is not discussed on the phone, but discussed in person with **GILLUM**.

16.    On or about January 15, 2017, UCE 1 and UCE 2 met with Individual B in Nashville, Tennessee. Individual B asked UCE 2 for $25,000 in contributions

5

to **GILLUM**'s campaign in relation to three projects that Individual B proposed. Individual B asked UCE 1 for $75,000 related to three different projects. Individual B further explained that the money for **GILLUM's** campaign would go through another company's account.

17.     On or about February 15, 2017, UCE 1 met with **GILLUM** and Individual B in Jacksonville, Florida. During the meeting, UCE 1 advised that he was fine with the full amount of $100,000 for the campaign contribution, and could probably come up with first $50,000 the first week of March, and the second half at the end of the month or the next month. **GILLUM** told UCE 1 that UCE 1 should separate in his mind the campaign contributions and the Tallahassee projects. In **GILLUM's** presence, UCE 1 asked Individual B if they needed to go talk to Individual G about the money process so there would be no identification of UCE 1 as the contributor, and Individual B told UCE 1 they would talk later. UCE 1 acknowledged that they could do something creative like the dinner contribution.

18.     On or about March 13, 2017, UCE 1 met with **GILLUM** in Tallahassee, Florida. During the meeting, UCE 1 discussed the campaign contributions and the increase in the contribution amounts that Individual B told UCE 1 in relation to the three projects and further advised that he was still at the $100,000 level for the campaign contribution if a certain project was viable. **GILLUM** told UCE 1 that UCE 1 should separate in his mind the campaign

6

contributions and the Tallahassee projects, and then indicated he looked favorably on UCE 1's proposed projects. UCE 1 advised **GILLUM** that the UCEs were going to meet with Individual G that evening, and **GILLUM** stated that Individual G was a good guy and knows his stuff very well.

19.     On or about June 14, 2017, **GILLUM** voluntarily agreed to speak with FBI agents. During the conversation, **GILLUM** falsely represented that Southern Pines representatives never offered **GILLUM** anything or gave to **GILLUM** anything, and that **GILLUM** stopped having communications with Southern Pines representatives about the campaign contributions following their attempt to link the campaign contributions to support for potential projects in Tallahassee.

## B. THE CHARGE

20.     On or about June 14, 2017, in the Northern District of Florida, the defendant,

### ANDREW DEMETRIC GILLUM,

did knowingly and willfully make materially false, fictitious, and fraudulent statements and representations in a matter within the executive branch of the Government of the United States, that is, during a criminal investigation of public corruption involving the City of Tallahassee conducted by the Federal Bureau of Investigation, the defendant falsely stated that:

       a.      Southern Pines representatives never offered **GILLUM** anything or gave to **GILLUM** anything; and

       b.      **GILLUM** stopped having communications with Southern Pines representatives about the campaign contributions following their attempt to link the campaign contributions to support for potential projects in Tallahassee.

21.    These statements and representations were false because, as **GILLUM** then well knew:

       a.      Southern Pines representatives did offer and give to, **GILLUM** a hotel room, meals, a boat tour of New York Harbor, and tickets to the Broadway show "Hamilton," which was paid for by Southern Pines representatives; and

       b.      **GILLUM** continued to communicate with Southern Pines representatives concerning Southern Pines representatives making campaign contributions to **GILLUM** after the Southern Pines representatives attempted to link the campaign contributions to support for pending projects in Tallahassee.

In violation of Title 18, United States Code, Section 1001(a)(2).

# COUNT TWO

## A. INTRODUCTION

Except as otherwise indicated, at all times material to this Indictment:

22.     The allegations in paragraphs 1 through 19 of Count One of this Indictment are hereby realleged and incorporated by reference as if fully set forth herein.

23.     Between in or about 2003 and in or about February 2017, while serving as an elected official of the City of Tallahassee, **GILLUM** was also employed by Organization A. In 2016, Organization A paid **GILLUM** a salary of approximately $122,500.

24.     P&P Communications, Inc. ("P&P"), was an S corporation wholly owned by **GILLUM**'s longtime associate, **LETTMAN-HICKS**. P&P had an office building at 1550 Melvin Street, Tallahassee, Florida. The primary sources of income for P&P were rental payments generated by lessees at P&P's office building, including Organization A. In 2016, Organization A paid approximately $3,000 per month in rent to P&P for space in the office building at 1550 Melvin Street for **GILLUM**'s work for Organization A. Starting in or around March 2017, **GILLUM** began receiving regular payments from P&P's bank account purporting to be either employee wages or contractor payments.

## B. THE CHARGE

25.     Beginning on or about February 16, 2016, and continuing until on or about May 28, 2020, in the Northern District of Florida and elsewhere, the defendants,

**ANDREW DEMETRIC GILLUM**
**and**
**SHARON JANET LETTMAN-HICKS,**

did knowingly and willfully combine, conspire, confederate, and agree together and with other persons to devise a scheme to defraud and to obtain money and property by means of material false and fraudulent pretenses, representations, and promises, and to cause wire communications to be transmitted in interstate and foreign commerce for the purpose of executing such scheme, in violation of Title 18, United States Code, Section 1343.

## C. MANNER AND MEANS

26.     Between 2016 and 2019, the defendants engaged in an on-going and evolving scheme to defraud by unlawfully soliciting and obtaining funds from various entities and individuals through false and fraudulent representations and promises that the funds would be used for a legitimate purpose, but instead using third parties to divert a portion of those funds to P&P, which **LETTMAN-HICKS** then fraudulently provided to **GILLUM** for his personal use disguised as payroll payments.

10

27.     When **GILLUM** began actively campaigning as a candidate for
Governor of the State of Florida, **GILLUM** submitted a letter of resignation from
his position at Organization A on or about February 9, 2017. That resignation
caused **GILLUM** to lose a salary of approximately $122,500 per year, which
comprised over half of his 2016 household income. At the time, **GILLUM** had
significant personal expenses. Additionally, Organization A terminated its lease
with P&P, resulting in a loss of approximately $3,000 per month in rent to P&P.

28.     On or about March 14, 2017, **LETTMAN-HICKS** filed P&P's
annual report with the Florida Department of State identifying **GILLUM** as a
director and vice president of P&P. That same day, **LETTMAN-HICKS** provided
**GILLUM** with an employee enrollment form listing a salary of $10,000 per
month. After deducting employee withholdings, **LETTMAN-HICKS** paid
**GILLUM** bimonthly checks from P&P in the amount of $3,584.01.

29.     Subsequently, between March 2017 and November 2018,
**LETTMAN-HICKS** paid **GILLUM** with bimonthly checks from funds
fraudulently and unlawfully diverted to P&P, in addition to other payments.
Starting in approximately February 2018, **GILLUM**'s payments were increased to
$5,000, but the notation for payment in P&P's bank records indicated **GILLUM**'s
status was changed from employee to independent contractor.

11

30.    However, **GILLUM's** position at P&P was only a cover used to provide him funds that he lost when he resigned from Organization A. As set forth below, those funds were obtained from the conspiracy to defraud a variety of organizations and individuals.

## CDLS GRANT FRAUD

31.    Defendants **GILLUM** and **LETTMAN-HICKS** defrauded Organizations C and D of $50,000 in grant money by falsely representing that the grant money would only be used for the Campaign to Defend Local Solutions ("CDLS"), which was created in approximately the middle of 2016 as part of **GILLUM's** efforts against state preemption of local governments' regulations in certain areas.

32.    To fund this CDLS effort, **GILLUM** sought grants from non-profit organizations to support this effort, including Organization B; Organization C, where **GILLUM** was a member of the Board of Directors; and Organization D, which was a component of Organization B. The CDLS never had any independent corporate identity.

33.    On or about July 7, 2016, **GILLUM** asked Organization C for a grant to Forward Florida PAC. **GILLUM** stated his goal was to raise $250,000 to hire an organizer and media firm, with Forward Florida serving as the "organizational

vehicle." A representative of Organization C expressed support but stated that it could not use its organization for this purpose.

34.    **GILLUM** and **LETTMAN-HICKS** caused the National Black Justice Coalition ("NBJC"), an entity created pursuant to Title 26, United States Code, Section 501(c)(3), to serve as "fiscal sponsor" and accept the funds from Organizations C and D for the CDLS effort.

35.    On or about August 24, 2016, **GILLUM** sent an email to Organization C which included a project proposal, budget, and supporting documentation. The total proposed budget of $201,552 included $50,000 for the campaign manager, $90,000 for a communications consultant, and $41,412 in overhead, including office rent and administrative costs. The proposed budget did not disclose that funds would be transferred to P&P or be used to pay **GILLUM**.

36.    Organization C provided $100,000 in grant money and Organization D provided $100,000 to NBJC as fiscal agent for the CDLS effort. When the money was awarded, each organization placed conditions on the grant indicating the money could only be used for the specified purposes and that any money not used for such purposes must be returned. The grant conditions did not allow any grant money to be paid to **GILLUM**.

37.    However, **LETTMAN-HICKS** used her position as Executive Director and CEO of the NBJC to divert $50,000 of the funds donated by

13

Organizations C and D. She did so by purchasing a $25,000 cashier's check from NBJC's bank account on March 16, 2017, and another $25,000 cashier's check on May 30, 2017. On those same dates, each cashier's check was deposited in the bank account of P&P.

38.   **LETTMAN-HICKS** then distributed the fraudulently obtained funds to **GILLUM**, disguised as salary payments from P&P, and in so doing, caused interstate wire communications to occur.

39.   Additionally, **GILLUM** and **LETTMAN-HICKS** attempted to conceal the misuse of the funds. They did so by causing Individual D to falsely record the disbursements of the funds as "Communications/Marketing" expenses for the CDLS in the accounting records of the NBJC.

40.   They also falsely told Individual C that they had "frozen" $50,000 as reserve funds for the CDLS, when, in fact, those funds had been disbursed to P&P and most of the funds provided to **GILLUM**.

41.   Finally, **LETTMAN-HICKS** caused a false Narrative Report and a Financial Report to be submitted by interstate wire communications, namely, emails, to Organization D to comply with the reporting requirements of CDLS grant. The Financial Report purported to cover all Actual Costs for the CDLS for the period November 1, 2016, through November 30, 2017, but was materially

false in that the $50,000 of grant funds diverted to P&P was not reported. Instead, the money was concealed as spent or still available for use for the CDLS project.

## CAMPAIGN CONTRIBUTION FRAUD

42.    In 2018, **GILLUM** and **LETTMAN-HICKS** defrauded Individual F of $150,000 of his $250,000 contribution to **GILLUM's** campaign for Governor of the State of Florida.

43.    The Forward Florida PAC was a type of tax-exempt organization under Title 26, United States Code, Section 527, for the general purpose of advancing **GILLUM's** political prospects. A Section 527 group is created primarily to influence the selection, nomination, election, appointment, or defeat of candidates to federal, state, or local public office.

44.    On or about February 16, 2016, Forward Florida PAC filed a "Statement of Organization of Political Committee" with the Florida Department of State. Under Florida law, a "political committee" was an organization that, among other things, accepted contributions or made expenditures for the purpose of expressly advocating the election or defeat of a candidate or the passage or defeat of an issue.

45.    The Andrew Gillum For Governor ("GFG") campaign was initiated by **GILLUM.** Individual E was the finance director, managing GFG's "hard account" for campaign contributions with specified limits for each contributor, and

15

reporting requirements, and Forward Florida PAC's "soft account," which had no contribution limits but did have reporting requirements.

46.     In May 2018, **GILLUM** solicited Individual F to contribute money to **GILLUM**'s campaign for Governor and falsely and fraudulently represented to Individual F that the entire contribution would be used for **GILLUM's** campaign for Governor.

47.     Based upon **GILLUM's** false representation that the contribution would be used solely for **GILLUM's** campaign for Governor, Individual F agreed to give a $250,000 contribution for **GILLUM's** campaign for Governor.

48.     Instead of depositing the funds into the GFG campaign or Forward Florida PAC accounts, the defendants caused the $250,000 to be wired into an account of Organization E, a 501(c)(4) organization, managed by an acquaintance whom **GILLUM** and **LETTMAN-HICKS** could control.

49.     **GILLUM** made statements to his campaign financial advisor about the non-availability of other organizations to accept the $250,000 donation to justify his direction of this contribution to Organization E.

50.     On or about June 16, 2018, Individual E asked **GILLUM** via email how **GILLUM** wanted to utilize the $250,000 contribution received from Individual F. **GILLUM** replied via email that another $50,000 should move to Forward Florida PAC and that **LETTMAN-HICKS** would "manage" the rest.

16

51.     **LETTMAN-HICKS** then caused Organization E to provide only $100,000 of the $250,000 campaign contribution into the Forward Florida PAC account. **LETTMAN-HICKS** then obtained the remaining money for P&P by arranging a fraudulent contract with Organization E to allegedly provide services on a voter education program regarding the gubernatorial candidates, knowing that these services would not be performed. Pursuant to the fraudulent contract, P&P obtained $132,500 of Individual F's campaign contribution, which was then disbursed to **LETTMAN-HICKS** and **GILLUM**.

52.     **GILLUM** and **LETTMAN-HICKS** attempted to conceal the fraud by failing to submit a required final report to Organization E detailing the actual services performed pursuant to the contract, then later filing a fraudulent final report which falsely represented that P&P had worked closely with certain organizations and provided various deliverables or services when it had not done so. The report was only submitted after repeated requests from Organization E following its receipt of a subpoena requesting all records and documents relating to the contract.

53.     **LETTMAN-HICKS** created and submitted the false final report more than a year after it was due to conceal the fact that **LETTMAN-HICKS** used the campaign funds for the personal benefit of **GILLUM** and herself.

## "GET OUT THE VOTE" CAMPAIGN FUNDS FRAUD

54.     The laws of the State of Florida, specifically Section, 106.1405, Florida Statutes, provided that a candidate may not use funds on deposit in a campaign account to defray normal living expenses for the candidate, other than expenses actually incurred for transportation, meals, and lodging by the candidate or a family member during travel in the course of the campaign.

55.     The laws of the State of Florida, specifically Section 106.07, Florida Statutes, provided that a candidate or designated campaign treasurer must file with the Florida Department of State detailed quarterly reports of all campaign contributions received, and all expenditures made from a campaign account, by or on behalf of such a candidate.

56.     The laws of the State of Florida, specifically Section 106.141, Florida Statutes, provided that a candidate who is elected to office must within ninety days dispose of funds on deposit in a campaign account in accordance with Section 106.141 and file a report reflecting the disposition of said funds. Pursuant to Section 106.141, the authorized disposition of funds does not include payment of the candidate's salary. The personal use of surplus campaign funds was not permitted.

57.     On or about February 28, 2017, **GILLUM** filed a Statement of Candidate form DS-DE84 with the Florida Department of State in which

18

**GILLUM** affirmed that he had been provided access to read and understand the requirements of Chapter 106, Florida Statutes, which pertained to Florida election financing laws.

58.     In November 2018, just prior to the election, **GILLUM** and **LETTMAN-HICKS** caused $130,000 from GFG campaign to be provided to a fiscal agent for GFG to conduct "Get Out the Vote" ("GOTV") efforts.

59.     After the election, **GILLUM** sent an email to certain GFG campaign personnel stating, "As we proceed to wrap up the affairs of the campaign, I am assigning Sharon [**LETTMAN-HICKS**] to oversee the campaign budgets (GfG and FF) starting today."

60.     **GILLUM** and **LETTMAN-HICKS** caused $60,000 of the GOTV funds to be moved into P&P's bank account by falsely and fraudulently representing to a fiscal agent for GFG that the $60,000 was for reimbursement for expenses that P&P had incurred relating to the GOTV efforts, knowing that P&P had not incurred such costs and knowing instead that the diverted funds would be used  for the personal benefit of **GILLUM** and **LETTMAN-HICKS** in violation of state law requirements.

61.     When the money was deposited into P&P's bank account, **LETTMAN-HICKS** caused multiple interstate wire transfers to benefit

19

**GILLUM,** including six payments of $5,000 each made directly to **GILLUM's** account, four of which were marked as "End of year Bonus."

62.     To conceal the fraud, **GILLUM** and **LETTMAN-HICKS** caused the GFG to file an amended campaign treasurer's report with the State of Florida that falsely stated that an expenditure of $60,000 was made from campaign funds to P&P for the purpose of "Get Out The Vote Canvassing."

63.     In furtherance of the conspiracy, the conspirators performed acts and made statements to hide and conceal, and cause to be hidden and concealed, the purpose of the conspiracy and the acts committed in furtherance thereof.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS THREE THROUGH EIGHT

## A. INTRODUCTION

64.     The allegations in paragraphs 22 through 63 of Count Two of this Indictment are hereby realleged and incorporated by reference as if fully set forth herein.

## B. THE CHARGE

65.     Between on or about July 7, 2016, and on or about December 31, 2018, in the Northern District of Florida and elsewhere, the defendants,

**ANDREW DEMETRIC GILLUM**
**and**
**SHARON JANET LETTMAN-HICKS,**

20

did knowingly and willfully devise, and intend to devise, a scheme to defraud and

for obtaining money and property by means of material false and fraudulent

pretenses, representations, and promises from Organizations B, C, and D, and for

the purpose of executing such scheme, did cause the following wire

communications to be transmitted in interstate and foreign commerce on or about

the following dates as set forth below:

| COUNT | DATE | WIRE COMMUNICATION |
|-------|------|--------------------|
| **THREE** | 6/15/2017 | Deposit of $3,584.01 cashier's check from P&P to **GILLUM**'s account |
| **FOUR** | 7/10/2017 | Deposit of $6,000 cashier's check from P&P to **GILLUM**'s account |
| **FIVE** | 7/31/2017 | Deposit of $3,584.01 cashier's check from P&P to **GILLUM**'s account |
| **SIX** | 8/18/2017 | Deposit of $3,584.01 cashier's check from P&P to **GILLUM**'s account |
| **SEVEN** | 9/14/2017 | Email from **LETTMAN-HICKS** to Individual C re freezing of $50,000 of CDLS funds |
| **EIGHT** | 11/30/2017 | Email submission of false report to Organization D |

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS NINE THROUGH FIFTEEN

## A. INTRODUCTION

66.     The allegations in paragraphs 22 through 63 of Count Two of this

Indictment are hereby realleged and incorporated by reference as if fully set forth herein.

## B. THE CHARGE

67.    Between on or about January 1, 2017, and on or about December 31, 2019, in the Northern District of Florida and elsewhere, the defendants,

**ANDREW DEMETRIC GILLUM**
**and**
**SHARON JANET LETTMAN-HICKS,**

did knowingly and willfully devise, and intend to devise, a scheme to defraud and for obtaining money and property by means of material false and fraudulent pretenses, representations, and promises from Individual F, and for the purpose of executing such scheme, did cause the following wire communications to be transmitted in interstate and foreign commerce on or about the following dates as set forth below:

| COUNT | DATE | WIRE COMMUNICATION |
|:-----:|:----:|:------------------|
| **NINE** | 5/22/2018 | Text Message from **LETTMAN-HICKS** to Organization E representative needing "to move 250K thru a C-4 ASAP" |
| **TEN** | 7/9/2018 | Text message from **LETTMAN-HICKS** to Organization E representative falsely stating the donor was "breathing down [her] neck and may demand his money back" and that the money was for field work |
| **ELEVEN** | 7/13/2018 | Wire transfer of $66,250 from Organization E account to P&P account |

| COUNT | DATE | WIRE COMMUNICATION |
|---|---|---|
| **TWELVE** | 8/8/2018 | Wire transfer of $66,250 from Organization E account to P&P account |
| **THIRTEEN** | 9/4/2018 | Deposit of $10,000 cashier's check from P&P to **GILLUM**'s account |
| **FOURTEEN** | 9/17/2018 | Deposit of $10,000 cashier's check from P&P to **GILLUM**'s |
| **FIFTEEN** | 12/2/2019 | Email sent by **LETTMAN-HICKS** to Organization E containing false report |

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS SIXTEEN THROUGH TWENTY-ONE

## A. INTRODUCTION

68.     The allegations in paragraphs 22 through 63 of Count Two of this

Indictment are hereby realleged and incorporated by reference as if fully set forth

herein.

## B. THE CHARGE

69.     Between on or about January 1, 2017, and on or about November 5,

2019, in the Northern District of Florida and elsewhere, the defendants,

**ANDREW DEMETRIC GILLUM**
**and**
**SHARON JANET LETTMAN-HICKS**,

did knowingly and willfully devise, and intend to devise, a scheme to defraud and

for obtaining money and property by means of material false and fraudulent

pretenses, representations, and promises from the Gillum For Governor campaign,

23

and for the purpose of executing such scheme, did cause the following wire communications to be transmitted in interstate and foreign commerce on or about the following dates as set forth below:

| COUNT | DATE | WIRE COMMUNICATION |
|---|---|---|
| **SIXTEEN** | 11/7/2018 | Email sent from **GILLUM** to GFG staffers advising he assigned **LETTMAN-HICKS** to oversee the campaign budgets |
| **SEVENTEEN** | 11/20/2018 | Deposit of $60,000 check payable to P&P from GFG Fiscal Agent into P&P's bank account and related wire communication |
| **EIGHTEEN** | 11/20/2018 | $5,000 "bonus" wired from P&P account to **GILLUM** account |
| **NINETEEN** | 11/21/2018 | $5,000 "bonus" wired from P&P account to **GILLUM** account |
| **TWENTY** | 11/26/2018 | $5,000 "bonus" wired from P&P account to **GILLUM** account |
| **TWENTY-ONE** | 11/29/2018 | $5,000 "bonus" wired from P&P account to **GILLUM** account |

In violation of Title 18, United States Code, Sections 1343 and 2.

## CRIMINAL FORFEITURE

70.    The allegations contained in Counts Two through Twenty-One of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeiture. From their engagement in the violations alleged in Counts Two through Twenty-One of this Indictment, the defendants,

**ANDREW DEMETRIC GILLUM**
**and**
**SHARON JANET LETTMAN-HICKS,**

24

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any and all of the defendants' right, title, and interest in any property, real and personal, constituting, and derived from, proceeds traceable to such offenses.

71.    If any of the property described above as being subject to forfeiture, as a result of acts or omissions of the defendants:

      i.     cannot be located upon the exercise of due diligence;

      ii.     has been transferred, sold to, or deposited with a third party;

      iii.     has been placed beyond the jurisdiction of this Court;

      iv.     has been substantially diminished in value; or

      v.     has been commingled with other property that cannot be subdivided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c),

to seek forfeiture of any other property of said defendants up to the value of the

forfeitable property.

A TRUE BILL:

**REDACTED**

FOREPERSON

_____

June 7, 2022.

DATE

_____

JASON R. COODY
United States Attorney

_____

STEPHEN M. KUNZ
Assistant United States Attorney

_____

ANDREW J. GROGAN
Assistant United States Attorney

26