UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

CASE NO. 4:22-CR-00027/WINSOR/FITZPATRICK

UNITED STATES OF AMERICA

v.

ANDREW DEMETRIC GILLUM and
SHARON JANET LETTMAN-HICKS,

　　　Defendants.
_____/

## ANDREW GILLUM'S MOTION FOR DISCOVERY AND A HEARING ON THE GOVERNMENT'S SELECTIVE PROSECUTION

Andrew Gillum moves for discovery and an evidentiary hearing to explore what appears to be selective prosecution. Gillum was the target of a relentless year-long undercover operation while campaigning for public office while other gubernatorial candidates against whom significant allegations were made were not subjected to any such investigation during or after their campaigns.

## I.   Background

On June 7, 2022, the Government filed an Indictment against Andrew Gillum and Sharon Lettman-Hicks. The Government charges Gillum with making a false statement to the FBI, conspiracy to commit wire fraud, and substantive wire fraud. Indictment, ECF No. 1.

The Indictment reveals that in April 2015, the FBI began a public corruption investigation against Gillum in Tallahassee. *Id.* at p. 2. An undercover agent, "UCE 1" "posed as a developer interested in purchasing and developing property in Tallahassee through a company known as Southern Pines Development LLC ('Southern Pines')." *Id.* UCE 1 was then introduced to public officials in Tallahassee so that he could try and convince them to enter into a pay-to-play scheme (i.e., accepting money in exchange for them taking government actions to assist in development projects). *Id.*

UCE 1 and UCE 2 infiltrated those close to Gillum for about a year. In May 2016, Gillum met up with UCE 1 and UCE 2 during Gillum's trip to New York, where Gillum, along with others close to Gillum, are alleged to have gone on a boat ride, watched *Hamilton*, and stayed in the same hotel as UCE 1 and UCE 2, who are alleged to have paid for the events

(though the Indictment does not allege that Gillum knew this). See *id.* at ¶ 10.

On multiple occasions, UCE 1 attempted to get Gillum to agree to link campaign contributions to support for Southern Pines' potential projects in Tallahassee. Gillum never caved to UCE 1's pressure to enter into a quid pro quo agreement. *See id.* at pp. 6-7. Gillum told UCE 1 on at least two separate occasions (February 15, 2017, and March 13, 2017) that UCE 1 "should separate in his mind the campaign contributions and the Tallahassee projects." *Id.*

Two months later, on June 14, 2017, FBI agents asked Gillum about his conversations with the Southern Pines representatives. *Id.* at ¶ 19. This conversation was recorded and transcribed. As detailed in Gillum's Motion To Dismiss The False Statement Charge, the Indictment entirely misrepresents the conversation and Gillum did not in fact make any false statements.

After the June 14, 2017 conversation with FBI agents, Gillum was not charged with any public corruption charges or campaign fraud associated with the Southern Pines public corruption investigation. But it appears that in the years after the election, the FBI continued digging

for any dirt it could find on Gillum, settling on the alleged mishandling of funds by his mentor and former boss Sharon Lettman-Hicks, which is alleged in Counts 2-21.

## II.    Argument and Memorandum of Law

Gillum is entitled to discovery and an evidentiary hearing on whether he was singled out, investigated, and prosecuted because he was a Black candidate for Governor, as appears to be the case. Florida has a history of suppressing Black citizens from participating in the political system, which continues to this day. Gillum faced racial discrimination at the time he was running for Governor, which his opponent, Ron DeSantis, capitalized upon.

As a result of this discrimination, Gillum was the target of an unprecedented aggressive year-long undercover investigation while running for Governor and now a prosecution for alleged mishandling of funds by Sharon Lettman-Hicks. The Government did not similarly investigate his opponent, Ron DeSantis, and other gubernatorial candidates, like Rick Scott, even after allegations of concealing large donations and health care fraud. The only difference between Gillum and these other candidates is that Gillum is Black.

By targeting the Gillum campaign, the FBI caused fear and mistrust in the first viable campaign by an African American to become Governor of the State of Florida. Ron DeSantis used the FBI probe surrounding the *Hamilton* ticket as a smear campaign during press interviews and during the gubernatorial debate, which likely cost Gillum votes in an election with razor-thin margins.

"Although prosecutorial discretion is broad, it is not unfettered." *Wayte v. United States*, 470 U.S. 598, 608 (1985) (internal citation omitted). The decision to prosecute may not be based upon "an unjustifiable standard such as race, religion, or other arbitrary classification'" or the "exercise of protected statutory and constitutional rights." *Id.* (internal citation omitted). To support a claim of selective prosecution, a defendant must establish two things: first, "that he has been singled out for prosecution while others similarly situated have not generally been proceeded against for the type of conduct with which he has been charged," and second, that the decision to prosecute "was based upon an impermissible factor such as race" or political affiliation. *United States v. Gordon*, 817 F.2d 1538, 1539 (11th Cir. 1987).

In determining whether a defendant has established a claim for selective prosecution, the Court looks to "ordinary equal protection standards." *United States v. Armstrong*, 517 U.S. 456, 465 (1996). "To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted." *Id.* A defendant is entitled to an evidentiary hearing if he can show that he has a "colorable basis" for a selective prosecution claim. *United States v. Gordon*, 817 F.2d 1538, 1540 (11th Cir. 1987), *opinion vacated on other grounds*, 836 F.2d 1312 (11th Cir. 1988). Or said differently, a defendant must allege "sufficient facts to take the question past the frivolous state and raise[] a reasonable doubt as to the prosecutor's purpose." *Id.* (internal citation omitted); *see also United States v. Berrios*, 501 F.2d 1207, 1210 (2d Cir. 1974) (finding defendant entitled to hearing on selective prosecution issue where he made prima facie case of selective prosecution). Similarly, a defendant is entitled to discovery related to his defense of selective prosecution where he provides "some evidence tending to show the existence of the essential elements of the defense and that the documents in the government's

possession would indeed be probative of these elements." *See id.* at 1211-12.

For example, in *Gordon*, the Eleventh Circuit vacated and remanded Gordon's conviction for voter fraud to conduct an evidentiary hearing on his selective prosecution claim. 817 F.2d at 1539. Gordon had argued that the Government "chose to prosecute him and other black political leaders in Alabama's majority-black 'Black Belt' counties for voting fraud, while not prosecuting county residents who were members of a rival white-dominated political party and committing similar election offenses." *Id.* at 1540.

As to the first prong—whether Gordon had been singled out—the Eleventh Circuit found that Gordon presented evidence to support that there was a pattern of targeting counties where "blacks since 1980 had come to control some part of the county government" and that "members of the rival white political organization assisted law enforcement officials in their investigations of . . . the principal political organization representing blacks, of which Gordon was a leader." *Id.*

Regarding the second prong, that the decision to prosecute was in bad faith, the Eleventh Circuit noted that "a court must undertake 'a

sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" *Id.* (citing *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 266, (1977)). Such evidence may include evidence of disparate impact. *Id.* Thus, the Eleventh Circuit found that the lower court erred by rejecting Gordon's racial impact or results evidence. *Id.* Because Gordon had sufficiently established the essential elements of a selective prosecution claim, he was "entitled to an evidentiary hearing on the selective prosecution claim so the full facts may be known." *Id.* at 1540. Further, Gordon was entitled to discovery "of the relevant Government documents relating to the local voting fraud cases the Government has prosecuted and any voting fraud complaints which they have decided not to pursue." *Id.*

Here, it appears that Gillum was singled out, investigated, and prosecuted because he was a Black candidate for Governor, while others similarly situated (white and Republican candidates for Governor) have not been targeted, investigated, and prosecuted in the same manner. Gillum, who is Florida's first Black gubernatorial candidate, has established the first element that he is a member of an "identifiable group" that is "a recognizable, distinct class, singled out for different

treatment under the laws, as written or as applied." *Castaneda v. Partida*, 430 U.S. 482, 494 (1977).

Florida has historically suppressed Black voters and Black candidates from political participation. As explained in *League of Women Voters of Florida*:

> Florida has a grotesque history of racial discrimination. For example, Professor Austin, whom this Court accepted as an expert on Florida elections and Black and Latino political participation, Tr. at 838, testified that Florida's first post-Civil War constitution never took effect because it extended the franchise to White males only, *id.* at 852.14 And even when Congress forced Florida to extend the franchise to Black men, Florida did everything it could to prevent those citizens from voting. As Dr. Kousser—an expert in American politics, southern politics, and minority voting rights testified—during the post-Reconstruction period, Florida took incremental steps to limit the franchise. *Id.* at 1694–96. First, Florida altered its constitution to allow the governor to appoint all statewide officeholders, ensuring White domination of the executive branch. *Id.* at 1696. In 1887, the Florida Legislature enacted a proto-identification requirement, under which registration certificates were required to vote. *Id.* at 1697. In 1888, the Legislature passed the "Eight Box Law"—which "worked as a de facto literacy test"—and a poll tax. *Id.* at 1699. These measures—all facially neutral—had their desired effect; "Black voting dropped from 62 percent in 1888 to 11 percent in 1892." *Id.* at 855, 1699.
>
> Florida's White majority also used terrorism to suppress the Black vote, as Dr. Burch, an expert in—among other things—discriminatory barriers to voting, testified. In 1920 in Ocoee, Florida, "a man was lynched and 30 to 60 people were killed

and nearly all of the Black homes and churches were burned after a Black man tried to vote in an election that day." *Id.* at 935.

Restrictive voting laws and racial violence made a brutally effective pair. As late as 1960, only seven Black voters were registered in Gadsden County, even though Gadsden County had a voting-age Black population of over 12,000. *Id.* at 861–62. And there were no Black congressional representatives from Florida between 1877 and 1992. *Id.* at 869, 1705.

*League of Women Voters of Florida, Inc. v. Lee*, 4:21CV186-MW/MAF, 2022 WL 969538, at *18 (N.D. Fla. Mar. 31, 2022).

Racially and associated politically motivated discrimination continues in Florida to this day. Black voters in Florida are "extremely likely to vote for the Democratic Party." *Id.* at *20 (quoting *Cooper v. Harris*, 197 L. Ed. 2d 837 (2017) ("'[R]acial identification is highly correlated with political affiliation.' That has long been true in Florida."). And gubernatorial elections in Florida have had "razor-thin margins," hovering between 3% and 0.5%. *Id.* at *21. "In 2018, the margin of victory in Florida's gubernatorial race [(between Gillum and DeSantis)] was only 32,463 votes." *Id.*

As explained in *League of Women Voters of Florida*, the "toxic mixture of racially polarized voting and close elections amplifies the risk

that Florida's elected officials will target voters based on their race," which is exactly what has happened in the past 20 years. *Id.* at *26. "Florida has purged its voter rolls, the effects of which fell disproportionately on Black voters. And when Black voters tended to favor a form of voting, or when a change in the law opened more opportunities for Black Floridians to vote, the Legislature has acted to restrict those opportunities." *Id.*

In sum, Gillum can easily show that Florida has a history of suppressing Black people from participating in the political system, which continues to this day. Gillum faced racial discrimination at the time he was running for Governor, which his opponent and his supporters capitalized on. In August 2018, Ron DeSantis appeared on Fox News to launch his general election campaign, telling viewers, "The last thing we need to do is to monkey this up by trying to embrace a socialist agenda with huge tax increases and bankrupting the state." Many people believed DeSantis was referencing a racial slur and this comment was a racist dog whistle. Gina Martinez, Time, *GOP Candidate Criticized After Saying Black Opponent Would 'Monkey This Up'*, August 29, 2018, available at: https://time.com/5381672/ron-desantis-andrew-gillum/.

Following this comment by DeSantis, Florida voters received hateful robocalls from white supremacist groups referring to Gillum as a "monkey" and other derogatory terms. Octavio Jones, Tampa Bay Times, *Gillum targeted by new racist robocall in Florida governor race*, October 23, 2018, available at: https://www.nbcnews.com/politics/politics-news/gillum-targeted-new-racist-robocall-florida-governor-race n923406.

This is a unique case, involving few people that are similarly situated to Gillum. Andrew Gillum is the only Black candidate to win a gubernatorial primary race in Florida. Thus, he cannot point to data relating to other Black gubernatorial candidates that were also unfairly targeted by the Government. But it is clear that other gubernatorial candidates who are white (and Republican) have not been subjected to the same scrutiny and aggressive undercover operations as Gillum despite multiple reports of significant potential wrongdoing. *See, e.g.,* Nicholas Nehamas, Mary Ellen Klas, *Nonprofit funded with FPL cash backed DeSantis' 2018 campaign,* Miami Herald, Times/ Herald Tallahassee Bureau, September 7, 2022, available at: https://www.tampabay.com/news/florida-politics/2022/09/06/nonprofit-

funded-with-fpl-cash-backed-desantis-2018-campaign; Jim Turner, The News Service of Florida, *DeSantis: Arrested donors appeared "legitimate,"* October 16, 2019, available at: https://www.jacksonville.com/story/special/special-sections/2019/ 10/16/ desantis-received-money-from-pair-hit-with-federal-campaign-finance- charges/ 2515991007; Sheridan Wall, Miami Herald, *DeSantis hasn't returned $213,000 from man charged in illegal donor scheme*, October 28, 2022, available at: https://www. miamiherald.com/news/politics- government/article267892487.html; Amy Sherman, Politifact, March 3, 2014, available at: https://www.politifact.com/factchecks/2014/ mar/03/florida-democratic-party/rick-scott-rick-scott-oversaw-largest- medicare-fra; Sheridan Wall, Tampa Bay Times, *DeSantis has so far appointed more donors to political posts than Scott did*, October 20, 2022, available at: https://www. tampabay.com/news/florida- politics/elections/2022/10/20/desantis-has-so-far-appointed-more-donors- political-posts-than-scott-did/.

   To date, it does not appear that the Government has investigated any of these contributor appointees or their interactions with DeSantis to determine whether there was any quid pro quo agreement, nor did the

Government initiate an undercover sting operation to try and lure Ron DeSantis or Rick Scott and those around them to enter into a quid pro quo arrangement. The year-long sting operation against a gubernatorial candidate, during which undercover agents pretended to be Gillum's friends and befriended those around Gillum, appears to be unprecedented.

The Government, through the FBI, took up more than just the precious time and focus of a fundamentally important political campaign. By targeting the Gillum campaign, the FBI diverted and caused fear and mistrust in the first viable campaign by an African American to become Governor of the State of Florida. On the eve of the election, the *Hamilton* tickets "FBI probe" received national media attention and DeSantis used the Hamilton tickets and "FBI probe" as a smear campaign during press interviews and during the gubernatorial debate. *See* Skyler Swisher and Larry Barszewski, South Florida Sun-Sentinel, *Ron DeSantis, Andrew Gillum clash over FBI probe and race in fiery final debate*, October 24, 2018, available at: https://www.sun-sentinel.com/news/politics/fl-ne-governor-broward-debate-20181024-story.html. This was incredibly harmful as evidenced by the fact that Gillum lost the election by only

32,463 votes. The mere mention of an "FBI probe" undoubtedly lost Gillum at least that many votes.

The FBI chose that moment in political history to toxify the Gillum campaign, and even today, has nothing meaningful to show for it. After a year-long undercover operation, undercover agents never got Gillum to agree to a quid pro quo agreement. The only fruit of this year-long undercover operation are allegations that Gillum failed to report as gifts a boat ride, hotel room, and a *Hamilton* ticket (and the unfounded false statement charge). No charges were filed after this public corruption investigation. In the years after the election, it appears the FBI continued digging for any dirt it could find on Gillum, settling on the alleged mishandling of funds by Sharon Lettman-Hicks.

The Government's bad intent can also be gleaned by the charges it chose to bring against Gillum. As explained in detail in other motions, Gillum did not make any false statements during the June 14, 2017 conversation. Even if he had, the Government would have been aware of the facts supporting a false statement charge on June 14, 2017. Yet, the Government waited almost five years, until just one week before the statute of limitations would expire, to bring charges. It appears the

Government merely included this unfounded count so that it could tarnish Gillum and those around him by pleading otherwise irrelevant, inflammatory material.

Like in *Gordon*, Gillum has alleged "sufficient facts to take the question past the frivolous state and raises a reasonable doubt as to the prosecutor's purpose" here. *Gordon*, 817 F.2d at 1540. Gillum is entitled to a hearing and discovery of the Government's failure to pursue the myriad allegations of structured improper corporate funneling of funds supporting Ron DeSantis' campaign, where that candidate made statements at the beginning of the general election that were interpreted widely as being racially biased and where that candidate has pursued policies that are perceived widely as racially-based, such as his recent bill HB7, the "stop woke" bill that limits the discussion of race in schools. Similarly, Gillum is entitled to discovery regarding the Government's failure to investigate allegations surrounding Rick Scott, and other gubernatorial candidates.

Additionally, there are indications that one of the investigating FBI agents had a connection to another white candidate who opposed Gillum in the Democratic primary, potentially adding to the motive to target or

more aggressively investigate Gillum. Accordingly, discovery is needed to determine the nature of the relationship between the white candidate and the FBI agent's role in the investigation, including whether this FBI agent was involved with the decision to investigate Gillum.

The need for further discovery to fully establish the selective prosecution claim is compelling in this case. A copy of proposed discovery requests is attached to this motion as Exhibit A.

## CONCLUSION

In sum, Andrew Gillum moves for discovery and an evidentiary hearing based on what appears to be a selective relentless investigation and prosecution of Gillum based on his race.


## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1

Pursuant to Local Rule 7.1(B), the undersigned counsel conferred with AUSA Andrew Grogan. He advises that he opposes this motion.

The Undersigned certifies that this filing does not exceed 8,000 words, per Microsoft Word's word count, which complies with the word limit requirements set forth in Local Rule 7.1(F).

Respectfully submitted,

**MARKUS/MOSS** PLLC
40 N.W. Third Street, PH1
Miami, Florida 33128
Tel: (305) 379-6667
markuslaw.com

By:   /s/ David Oscar Markus
       David Oscar Markus
       Florida Bar Number 119318
       dmarkus@markuslaw.com

       /s/ Katherine E. Miller
       Katherine E. Miller
       Florida Bar Number 104790
       kmiller@markuslaw.com